John P. LEEN, et al., Plaintiffs,

v.

Glenn E. CARR, et al., Defendants.

No. 96 C 5911.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 19, 1996.

Susan Patricia Malone, Chicago, IL, for Plaintiffs.

Shona B. Glink, City of Chicago Law Department, Office of the Corporation Counsel, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

KEYS, United States Magistrate Judge.

### Introduction

This matter is before the Court on Plaintiffs' Motion For Preliminary Injunction, seeking to enjoin the Chicago Fire Department from hiring its November 1996 paramedic class. The underlying case involves a reverse discrimination charge by twenty-four applicants[1], who applied for Chicago Fire Department paramedic positions between August 12, 1992 and July 9, 1996, but were not selected for the November 1996 paramedic class.

Plaintiffs allege that the Chicago Fire Department's hiring process for its November

---

1. Although Plaintiffs' Second Amended Complaint stated this cause of action on behalf of thirty-two Plaintiffs, eight of the thirty-two original Plaintiffs were voluntarily dismissed pursuant to FED.R.CIV.P. 41(a)(1). (Defs.' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction [Defs.' Mem. in Opp.Prelim.Inj.] at 2 n. 1).

1996 paramedic class: (a) is an unlawful employment practice under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e; (b) violates sections 1981 and 1983 of the Civil Rights Act of 1864, 42 U.S.C. §§ 1981, 1983; and (c) contravenes the Municipal Code and Personnel Rules of the City of Chicago. (Second Amended Complaint). Jurisdiction is proper based on Plaintiffs' federal law claims, and this Court has pendant jurisdiction over the state law claim.[2]

For the following reasons, the Court denies Plaintiffs' Motion for Preliminary Injunction.

### *Factual Background*

Plaintiffs are twenty-four fully licensed paramedics who applied for paramedic positions with the Chicago Fire Department between August 12, 1992 and July 9, 1996, but have yet to be hired. Plaintiffs filed suit against the Commissioner of Personnel of the City of Chicago, the Fire Commissioner of the City of Chicago, and the City of Chicago (herein collectively referred to as "Defendants"), alleging that Defendants' practice of providing preferences to individuals who either participated in Citywide Colleges' paramedic training programs or were FACT members is arbitrary, capricious, and discriminatory. (Trial Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction [Pls.' Prelim.Inj.Mem.] at 3). Plaintiffs further allege that Defendants' hiring process contravenes provisions of the Municipal Code and the Personnel Rules of the City of Chicago. (Pls.Prelim.Inj.Mem. at 6). Accordingly, on October 16, 1996, Plaintiffs sought a preliminary injunction to enjoin Defendants from hiring the November 1996 paramedic class until the conclusion of this litigation. (Plaintiffs' Motion for Preliminary Injunction [Pls. Prelim.Inj.Mot. at 1]).

### A. The Chicago Fire Department Paramedic Hiring Process

To be considered for hire as a paramedic, an applicant must submit to the Department of Personnel for the City of Chicago ("Personnel") a completed application, along with documents verifying a valid Illinois Driver's License and a current paramedic state license. (Preliminary Injunction Hearing Record [R.] at 55). Each application is date and time stamped, and a receipt is given to the applicant. (R. at 80, 250). Applicants are told not to lose their receipts. (R. at 80, 250).

Thereafter, Personnel reviews each application to determine whether the applicant meets the minimal qualifications for the positions. (R. at 55). If an applicant is deemed "qualified," his or her name is placed on an eligibility list.[3] (R. at 55–56). Depending on the number of open paramedic positions, Personnel sends a referral list to the Chicago Fire Department. (R. at 100–03). The Chicago Fire Department paramedic hiring process is governed by the Municipal Code of Chicago ("Municipal Code") and the Personnel Rules of the City of Chicago ("Personnel Rules"). Specifically, Section 2–74–050 of the Municipal Code[4] grants the Commissioner of Personnel the duty and responsibility of establishing and maintaining a list of persons eligible for appointment to positions as paramedics. Both the Municipal Code and the

---

**2.** Plaintiffs sought a preliminary injunction only on their state law claim because two plaintiffs who had planned to testify as to facts supporting the racial discrimination claims were recently hired, and because of time considerations. (Trial Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction [Pls.' Prelim.Inj.Mem.] at 5 n. 2). Although the preliminary injunction hearing testimony addressed only the state law claim, jurisdiction is still proper.

**3.** The eligibility list for the November 1996 class consisted of approximately 450 applicants. (R. at 107).

**4.** The applicable sections of the Municipal Code were not entered into evidence by either party.

They were marked for identification as Plaintiffs' Exhibit 5, but were not offered into evidence. In their Motion for Preliminary Injunction, Plaintiffs indicated that the applicable sections of the Municipal Code were submitted as Exhibit E thereto. However, the Court has been unable to locate any exhibits submitted with the Motion for Preliminary Injunction, and none were attached thereto. The parties, in their pleadings and in their arguments, concede that the Municipal Code, as well as the Personnel Rules, govern the hiring of paramedics by the Fire Department. Therefore, the Court takes judicial notice of the applicable provisions of the Municipal Code.

Personnel Rules mandate that the Commissioner of Personnel establish and maintain a list of eligible candidates in order of their relative excellence in the respective examinations. (Municipal Code, Section 2–74–050; Defendants' Exhibit [Defs.' Ex.] 3 at 16). The Personnel Rules further require that the Commissioner of Personnel "test fairly the capacity and fitness of the applicant to efficiently perform the duties of the position." (Defs.' Ex. 3, at 12). Moreover, Personnel's hiring manual specifically details the screening criteria, and only after the manual has been officially revised may the screening criteria be changed. (R. at 71).

### B. Implementing Hiring Preferences

Notwithstanding the established hiring guidelines, at some time between the Spring of 1995 and the Spring of 1996, the Deputy Commissioner of Personnel of the City of Chicago, Robert Joyce, recommended, and the Deputy Commissioner of the Chicago Fire Department, Cortez Trotter, agreed that hiring preferences would be given to First Aid Care Team ("FACT") members and to students who attended one of the Citywide Colleges' paramedic training programs.[5] (R. at 72, 175).

The FACT program was developed by the Chicago Fire Department in response to complaints from residents of the Chicago public housing complexes that paramedics failed to timely respond to calls for assistance. (R. at 57). Through a Community Development Block Grant, and with the assistance of the Hull House Association, the Chicago Fire Department employs low to moderate income individuals in public housing complexes as "FACT members" to provide immediate response to 911 emergency calls and to stabilize patients until the Chicago Fire Department paramedics arrive. (R. at 57, 129–30). The Chicago Fire Department pays for FACT members to be trained in EMT–A (Emergency Medical Training—Advanced Course) or EMT–B (Emergency Medical Training—Basic Course), and if they qualify, to receive paramedic training at one of the Citywide Colleges. (R. at 112–13, 130–32).

To implement the preferences that Commissioners Trotter and Joyce promulgated, Personnel began recording, first by index cards and then by computer data base, each applicant's race, sex, whether the applicant graduated from a Citywide Colleges' paramedic training program, whether the applicant was a FACT member, and the date of application. (R. at 78, 81, 96; Pl's. Exh. 12). Personnel employees relied upon the data base list to determine which applicants would be referred to the Chicago Fire Department. (R. at 100–102).

### C. The November 1996 Paramedic Referral List

The paramedic referral lists prepared by Personnel for the Chicago Fire Department in May of 1996, and again in September of 1996, provided preferences to individuals who had attended Wright Junior or Malcolm X Colleges or who were listed as having participated as a FACT member.[6] (R. at 80). Specifically, 50% of the candidates referred for the November 1996 hiring were either FACT members or had attended a Chicago Citywide Colleges' paramedic program, while the remaining 50% of individuals referred to the Chicago Fire Department were selected on a seniority basis, determined by the date of their application. (R. at 43).

### D. Defendants' Proffered Reasons for the Preferences

Defendants assert that, providing a preference to the Citywide Colleges' paramedic trainees is justified because their programs provide individuals with a "more candid view

---

5. Presently, Malcolm X College is the only Citywide college paramedic training program in existence. (R. at 95). Wright Junior College offered a paramedic training program from 1994 until the Spring of 1996. (R. at 325). Notably, these programs were not in existence in the years that several Plaintiffs received their paramedic training. (R. at 226). Thus, these individuals could not have attended the Citywide Colleges' paramedic programs even if they had been aware of the preferences.

6. The September 1996 referral list did not indicate whether students were FACT employees or Chicago Citywide College paramedic graduates. (R. at 85–86, 99).

of the [Chicago] [F]ire [D]epartment operations." (R. at 175–176). According to Defendants, FACT employees received a preference because they "were already in the [Chicago Fire Department] system" and had "hands-on experience" with the Chicago Fire Department. (R. at 58).

Defendants also determined that paramedic programs at the Citywide Colleges deserved a preference because students who trained at these specific paramedic schools were more qualified than other students, given their familiarity with the Chicago Fire Department's Standing Medical Orders ("SMOs").[7] (R. at 59, 175–76, 180–81).

### Legal Analysis

#### A. Preliminary Injunction Standard

■ To prevail on a request for a preliminary injunction, the movant has the initial burden of showing, as a threshold matter, "(1) that the case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) that the movant will suffer irreparable harm if the injunction is not granted." *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 313 (7th Cir.1994). If the movant cannot establish some likelihood of success on the merits, irreparable harm, and that there exists no adequate remedy at law, then the court's inquiry ends and the preliminary injunction motion must be denied. *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir.1992).

■ If, on the other hand, the movant is able to establish some likelihood of success on the merits, irreparable harm, and that there exists no adequate legal remedy, then the court must balance that showing with the harm to the non-movant and the public if injunctive relief is granted. *Abbott Labs.*, 971 F.2d at 12. The balancing of equities "involves a 'sliding scale' analysis: the greater the movant's chance of success on the merits, the less strong a showing must it

make that the balance of harms is in its favor." *Storck,* 14 F.3d at 313–14.

#### B. Applying the Preliminary Injunction Framework

**1. Plaintiffs Have Established a Sufficient Likelihood of Success on the Merits of Their State Law Claim.[8]**

■ To prevail on their state law claim, Plaintiffs must demonstrate that they have a reasonable likelihood of proving that Defendants' selection process of the November 1996 paramedics contravened the hiring process established by the Chicago Municipal Code and its own personnel rules and that they are entitled to mandamus. Mandamus is issued "to direct a public official or body to perform a ministerial duty, one which does not involve the exercise of judgment or discretion." *Winston Plaza Currency Exchange, Inc. v. The Department of Financial Institutions,* 211 Ill.App.3d 1062, 156 Ill.Dec. 379, 570 N.E.2d 855 (1st Dist.), *appeal denied,* 141 Ill.2d 562, 162 Ill.Dec. 511, 580 N.E.2d 137 (1991). "A mandamus will be issued only where a plaintiff can demonstrate a clear right to the relief requested." *Fischer v. Brombolich,* 207 Ill.App.3d 1053, 1064, 152 Ill.Dec. 908, 566 N.E.2d 785 (5th Dist. 1991). A plaintiff need not establish "a case that will in all events warrant relief on the merits; it is only necessary that [he or she] raise a fair question as to the existence of the right claimed and that [he or she] will be entitled to the relief prayed for if the proof [ ] sustain[s] [his or her] allegations." *Id.* at 1066, 152 Ill.Dec. 908, 566 N.E.2d 785.

#### a. Defendants' Preferences Are Clearly Arbitrary.

At the preliminary injunction hearing, Plaintiffs presented evidence demonstrating that Defendants' preferences were based merely on the subjective opinions of Commissioners Joyce and Trotter that the favored training programs were superior to others

---

7. SMOs are "blueprints" of procedures a paramedic should follow in a particular medical situation. (R. at 323).

8. Because Plaintiffs seek a preliminary injunction only on their state law claim, they need not

demonstrate that they have a likelihood of being successful on their race discrimination claims, at this juncture. (See Pls.' Prelim.Inj.Mem., at 5 n. 2).

and that, in fact, non-preferred paramedic programs varied little, if any, from the preferenced training programs. First, the Commissioners did not disclose to the applicants that participation in Citywide Colleges' paramedic training or the FACT programs would be given any special consideration. (R. at 46, 248–49). Nor did the job announcement make applicants aware of these preferences.[9] (Pls.' Ex. 7). Moreover, applicants were not told to update their applications with any experience they may have gained by training with the Chicago Fire Department paramedics. (R. at 84).

Second, individuals, other than those who attended paramedic training at Citywide Colleges, have familiarity with Chicago Fire Department ambulances and SMOs. Such familiarity was given as a reason for the preferences. Specifically, Mario Inguanti had over 380 hours of provisional "ride time" with the Chicago Fire Department. (R. at 235). As a provisional paramedic, Mr. Inguanti testified that he worked shoulder-to-shoulder with Chicago Fire Department paramedics and was evaluated by them. (R. at 235–37). Moreover, Mr. Inguanti must have been sufficiently familiar with the Fire Department's operations, given that he was an instructor in Emergency Medical Training courses at Wright Junior College, one of the preferred paramedic programs. (R. at 242–43, 247, 253).

Third, Defendants never verified whether the database list classifying applicants as FACT members or students of the Citywide Colleges paramedic program was accurate. (R. at 70–71). One individual who neither attended a Citywide College nor participated in the FACT team received the preference. (R. at 83). Similarly, Defendants never tested individuals receiving the preferences to determine whether they actually were famil-

iar with Chicago Fire Department policies and procedures. (R. at 71).

Fourth, the evidence does not persuade the Court that the paramedic training programs offered by the Citywide Colleges are superior to those at non-preferred paramedic training programs or that Defendants had reason to believe that those programs were superior. Indeed, Commissioners Trotter and Joyce, the individuals who devised and implemented the preferences, were not familiar with the present paramedic training curricula at the Citywide Colleges, nor did they know whether or how the Citywide Colleges' training program differed from other paramedic training programs. (R. at 44–46, 62, 73, 160, 171–72, 362). Ironically, at least one Plaintiff has worked as an instructor at the Citywide paramedic programs and has witnessed some of his former students attain paramedic positions with the Chicago Fire Department, based on the preference. (R. at 243).

In addition, the Commissioners did not know the differences between SMOs in the Chicago system and those in other EMS (Emergency Medical Services) systems. (R. at 47). Thus, Defendants' assumption that trainees in these programs necessarily would be more familiar with the Standard Medical Orders than would those who trained elsewhere is clearly unfounded.

Finally, the testimony of Commissioners Joyce and Trotter make clear that Defendant has no objective basis for concluding that the paramedic training programs at Citywide Colleges and FACT are superior to those at any other training program. It is clear from their testimony that they unilaterally decided—for whatever other reasons—that these programs would be given preferences and the preferences were given.[10] In this regard, the testimony of Mr. Inquanti is instructive.

9. This Court is not persuaded by Defendants' contention that the job posting was a general announcement that would not contain such important information, in light of the explicit information about preferences for military Veterans. (Pls.' Ex. 7).

10. The record does not reveal the racial compositions of the Citywide Colleges and FACT paramedic training programs. However, the Complaint alleges that, had personnel certified persons to the Fire Department in order of their application dates, all or nearly all of those hired for the November, 1996 class would have been white. Plaintiffs contend, therefore, that the selection of the Citywide Colleges and FACT programs for favorable treatment was a pretext for racial discrimination. The Court assumes, from Plaintiffs' arguments, that the favored training programs are predominantly non-white.

He testified that Personnel Analyst Ann Nakaguchi told him that the City may change the criteria for selecting the names to be submitted to the Fire Department at any time. (R. at 247–249.)

**b. Defendants' Hiring Practice Contravenes the City's Municipal Code and Personnel Rules.**

■ Injunctive relief may be "granted against public officials with respect to their official acts when the acts complained of are outside their authority or unlawful." *Kilhafner v. Harshbarger*, 245 Ill.App.3d 227, 228–29, 185 Ill.Dec. 456, 614 N.E.2d 897 (3rd Dist.1993), *appeal denied*, 152 Ill.2d 561, 190 Ill.Dec. 891, 622 N.E.2d 1208 (1993). Plaintiffs successfully call into question the validity of the paramedic hiring process, in light of the policies and procedures set forth in the Personnel Rules and the hiring manual. Nothing in the Municipal Code authorizes the Commissioners to provide these preferences. (R. at 73). The Court is troubled by the implementation of a process in which the Deputy Commissioner of Personnel and the Deputy Commissioner of the Chicago Fire Department may unilaterally change the criteria by which applicants are to be selected— without advance notice to the applicants— and decide to provide a preference to certain paramedic training programs over others, without any specific regulation authorizing these individuals to do so. Such a process would be the penultimate in arbitrariness and capriciousness.

■ Therefore, Plaintiffs have demonstrated at least an even chance of succeeding on the merits of the case. The preferences are arbitrary and contravene the hiring guidelines because they are based on only a snapshot of one's application, and not a full range of the applicants' experience and abilities.

**2. Plaintiffs Cannot Demonstrate Irreparable Harm or That There Exists No Adequate Remedy at Law.**

■ An adequate remedy at law exists if the remedy is "clear, complete, and as practical and efficient to the ends of justice and its prompt administration as an equitable remedy." *Fischer*, 207 Ill.App.3d at 1065,

152 Ill.Dec. 908, 566 N.E.2d 785. In addition, "irreparable harm occurs only where monetary damages cannot adequately compensate the injury or where the injury cannot be measured by pecuniary standards." *Id.*

Plaintiffs assert that they will be irreparably harmed if their motion is not granted, as they continue to watch others, with less experience and seniority on the eligibility list, being called for hire before them. (R. 415–16). Plaintiffs also claim that they will suffer irreparable harm by not being able to fulfill their long-awaited aspirations of serving the City. (R. at 415–16). Plaintiffs further argue that, even if the Court issues an Order granting Plaintiffs retroactive seniority, back pay, and instatement as Chicago Fire Department paramedics, should they prevail in this case, Plaintiffs would nevertheless be deprived of opportunities that are based on seniority. (R. at 415). Finally, Plaintiffs assert that a court order mandating that certain Plaintiffs displace newly assigned paramedics would cause friction within the Chicago Fire Department. (R. at 419).

The Court is unpersuaded by Plaintiffs' arguments and finds that Plaintiffs could be sufficiently made whole by an Order granting them instatement, retroactive seniority, and back pay. Defendants have demonstrated that the City, in the past, has adjusted seniority in order to comply with court orders, and would adjust Plaintiffs' seniority should they ultimately prevail. (R. at 67, 138–39). The harms that Plaintiffs claim they will suffer appear to be tangible and economic ones that can be easily ascertained and rectified, pending the outcome of this litigation. *See Abbott Labs*, 971 F.2d at 15 (preliminary injunction warranted where plaintiff would suffer intangible harm, such as damage to reputation and loss of goodwill). Indeed, one Plaintiff testified that seniority does not affect much more than vacation time and the firehouse for which a paramedic may bid. (R. at 302).

Moreover, Plaintiffs cannot be said to be irreparably harmed by lost proficiency as paramedics. *See Monroe v. United Air Lines, Inc.*, 17 Av.Cas. (CCH) P17, 910; 31

Empl.Prac.Dec. (CCH) P33, 331 (N.D.Ill. 1983) (granting preliminary injunction where pilots at age 60 were forced to retire and would have lost essential flying skills and proficiency). Many Plaintiffs are currently employed as paramedics in the suburbs and will likely continue to work as such until the underlying litigation is resolved.[11]

### Conclusion

Plaintiffs' Preliminary Injunction Motion is **denied,** since Plaintiffs cannot meet the preliminary injunction threshold requirement that they demonstrate that they will suffer irreparable harm in the absence of such relief.

---

**11.** Given the June 1997 trial date, in all likelihood, Plaintiffs could be instated as Chicago Fire Department paramedics if they are successful at trial, before the next paramedic class is hired. Thus, there would be no need to displace the November 1996 class of paramedics.